# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JANE DOE, as the Natural Guardian of NANCY DOE, a Minor, MARY DOE, a Minor, and , a Minor, SUSAN DOE, a Minor, | ) ) ) ) ) | |
| | ) | C.A. No.: 05-424 (SLR) |
| Plaintiffs | ) ) | Trial By Jury Demanded |
| v. | ) ) ) | |
| CAPE HENLOPEN SCHOOL DISTRICT, DANE BRANDENBERGER, JANET MAULL, and CINDY CUNNINGHAM, | ) ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM IN RESPONSE TO DEFENDANTS' MOTION TO COMPEL INDEPENDENT MEDICAL EXAMINATIONNOTICE OF DEPOSITION**

GARY W. ABER (DSB #754)
Aber, Goldlust, Baker & Over
702 King Street, Suite 600
P.O. Box 1675
Wilmington, DE  19899
(302) 472-4900
Attorney for Plaintiffs

DATED:  March 17, 2008

The plaintiff, Jane Doe, as natural guardian for her minor child, Nancy Doe, responds to the defendants' motion to compel the minor child, Nancy Doe, to submit to a medical examination by a psychiatrist of the defendants' choosing ("IME"), by agreeing to the defendants right to an exam, but by submitting that this Court should "...specify the time, place, manner, conditions, and scope of the examination....", pursuant to Rule 35, <u>Federal Rules of Civil Procedure.</u>

## I.    **INTRODUCTORY FACTS**

This is an action brought on behalf of the minor child, Nancy Doe, against the defendants, alleging a violation of her rights to equal protection, the exercise of free speech, the free exercise of religion, and retaliation for the exercise of those rights, as well as a violation of the applicable provisions of the Delaware State Constitution, prohibiting preference being given to any one religion.

The plaintiff, Jane Doe, and the minor child, Nancy Doe, are native born Americans who practice the Muslim religion, and lived in the Cape Henlopen School District, in Sussex County Delaware.  During the school year 2003 and 2004, the adult plaintiff, Jane Doe, complained to officials at Cape Henlopen School District concerning first, anti-Muslim materials, lessons, and comments made during the anniversary of, and in connection with the approved educational materials concerning the incidents of September 11, 2001.  In addition, the adult plaintiff, because of concerns expressed to her by the minor child, Nancy Doe, also brought to the authorities of the Cape Henlopen School District the fact that the assigned teacher to Nancy Doe had, prior to the Christmas Holidays of 2003, on a daily basis, read to the class books concerning the Christmas Holiday, some of which were of a highly religious nature.  At this time Nancy Doe was in the fourth grade.

Following the complaints made by Jane Doe, to the authorities of the Cape Henlopen School District, concerning Nancy Doe's teacher's Christmas lessons, the teacher confronted Nancy Doe, in the classroom, and three times suggested that she transfer to another classroom, in a voice loud enough that the other students in the classroom could hear the suggestions (Depo. Nancy Doe, p. 21-24).[1]    Eventually, Nancy Doe, was involuntarily transferred from her previously assigned teacher's classroom to another classroom.   After being transferred, students in both her new classroom, and her former classroom began to make fun of her, calling her names, and referring to her as a "loser Muslim" and a troublemaker (Depo. Nancy Doe, p. 25-26). These actions took place during the lunch periods and recess time (Depo. Nancy Doe, p. 27-28).

On behalf of the plaintiff, Neil S. Kaye, M.D. has issued an expert report, in relation to the minor, Nancy Doe, which in relevant part states:

> "She clearly meets the criteria of Post Traumatic Stress Disorder (PTSD) having suffered threatening and shaming experiences that she clearly perceived as life threatening/altering, and as a direct result experiences/ demonstrates avoidant behavior, reliving/re-experiencing of the trauma and autonomic arousal...she was made to feel unwanted and unworthy. She was teased, humiliated, made to question her religion and beliefs, and ostracized."[2]

The defendants have suggested and requested a medical examination on behalf of the defendants to be performed by Joseph R. Novella, M.D., a Forensic Psychiatrist located in Washington D.C.[3]   As described by the defendants, in their memorandum, the defendants examination by Dr. Novella will take approximately seven (7) hours (10:00 a.m. to 5:00 p.m., with lunch break)(Defendant's Motion at p. 2), and will involve unspecified testing, with unnamed and unspecified written examinations.  Because of

---

[1] Excerpts from Nancy Doe's deposition are attached hereto as Exhibit No. 1.
[2] Dr. Kaye's report is attached hereto as Exhibit No. 2
[3] Dr. Novella's internet advertisement is attached hereto as Exhibit No. 3

the minor child, Nancy Doe's diagnosis of Post Traumatic Stress Disorder, and her fragile condition, the plaintiff has requested of the defendants, some description of the nature of the purposed written examinations to be conducted. This request was based upon the concern of the child's fragile condition and the stress and strain of undescribed psychological testing.[4]  Up until, and including the presentation of this motion by the defendants, the defendants have been unwilling to describe in anyway the exact nature and extent of the written testimony.

In connection with this motion Dr. Kaye has rendered an opinion that the requested defense examination may be "further traumatizing", and suggested that "Her fragile mental state should be taken into account if such an examination is necessary." [5]

As Dr. Kaye has stated, consistent with the principles of the "American Academy of Psychiatry and the Law that to allow, in situations, such as presented here, the minor plaintiff should be accompanied by a supportive person, which Dr. Kaye suggests to be either her mother or legal counsel.[6]  As shown by defendants' expert, Dr. Novella's website, his evaluations are also conducted "...in accordance with the standards of the "American Academy of Psychiatry and the Law", the same standards by which Dr. Kaye rendered his report.

With regards to the nature of the written testing to be performed, Dr. Kaye has suggested that it is within the standard of practice to make known what testing is to be conducted, a practice to which he has readily complied in conducting his own

---

[4] See correspondence between the parties, attached hereto as Exhibit No. 4 expressing concern over unknown tests such as MMPI-2, PAI, and MCMI-3.

[5] A copy of Dr. Kaye's letter report in connection with the purposed examination is attached hereto as Exhibit No. 5.

[6] The plaintiffs recognize, as discussed in the subsequent legal portion of this memorandum, that the Delaware Courts have held that an attorney should not be present during such an exam, and request that only the minor plaintiff have a supportive third person present, either in the form of her mother, or, as suggested by Dr. Kaye, Dr. Kaye himself.

examinations (Exhibit No. 5, p. 2).  The suggestion that by identifying the test to be given, that such identification would allow the person being evaluated to somehow prepare for or cheat during the exam is "...simply absurd; validity scales built into psychological testing help protect against any such outcome." (Dr. Kaye Letter: Ex. No. 5)

During the course of this litigation the difficulty of the minor child to submit to even a deposition has been demonstrated.  Originally, the minor child was scheduled to have her deposition taken immediately after the deposition of her two sisters, Mary Doe and Susan Doe, on October 1, 2007.  However, having witnessed their depositions, she became so physically ill, she could not submit to her own deposition that day. Subsequently her deposition was taken on December 10, 2007.  Unfortunately during the depositions, she became physically ill and had to take numerous breaks. (Nancy Doe Depo. p. 7, 15, 23, 25 and 27).

### II.    GIVEN THE FRAGILE CONDITION OF THE MINOR PLAINTIFF, THIS COURT SHOULD SPECIFY THE MANNER, CONDITIONS, AND SCOPE OF THE EXAMINATION TO BE PERFORMED ON BEHALF OF THE DEFENDANT, PURSUANT TO RULE 35(a).

The plaintiff in this matter does not dispute the defendants' right to have a forensic examination conducted in preparation of the litigation in this matter.  However, the plaintiff does believe that certain protective measures, as allowed by Rule 35(a) should be taken to prevent further harm to this already severely traumatized minor child.

A.    **Duration and Nature of Exam**; The defendants have suggested, in their memorandum, that their defendants' examination would require "...Nancy Doe to do nothing more than attend an evaluation and testing that is likely to be substantially similar to the evaluation and testing conducted by Dr. Kaye." (Defendants' Memorandum at p. 5).  Unfortunately, the examination being suggested by the

defendants, will be substantially more, both longer, and more burdensome than the examination conducted by Dr. Kaye. As Dr. Kaye's report describes his examination (Dr. Kaye Report, Exhibit No. 2), his report was based upon a ninety (90) minute interview of the minor plaintiff, and a review of her medical records, as well as a brief discussion with the minor plaintiff's mother. By contrast, the defendants suggest a seven (7) hour exam (Defendants Memorandum at p. 2), unknown and unspecified tests of an indeterminate length, and even, a potential second session (See Defendants email, October 8, 2007, Exhibit No. 4. Both the length and the unknown nature of the exam offer the potential, as described by Dr. Kaye, of additional harm to the minor child.

The defendants erroneously assert, citing Tomlin v. Holecek, 150 F.R.D. 628 (D.Minn. 1993), that the plaintiff seeks their expert to "...provide them with the **questions** and **specific details** regarding the evaluation." (Defendants' Memorandum, at p. 9; Emphasis added). As the correspondence between the parties (Exhibit No. 4) demonstrates plaintiff does **not** ask for the **questions**, nor the **specific details** of the evaluation. All the plaintiff seeks is the identification of the tests to be administered. With such identification plaintiffs' expert, Dr. Kaye, and/or plaintiffs' treating therapist, could offer the Court an opinion as to whether such test is unduly burdensome and with the potential for further trauma to the minor child. Without such basic preliminary information, the plaintiff is unable and not in a position to evaluate the potential traumatizing effect of such unidentified testing. In attempting to deny the plaintiff such basic information, the defendants cite Ragge v. MCA/Universal Studios, 165 F.R.D. 605 (C.D. Calif. 1995), for the proposition that defendant's examining doctor should not have to disclose the test. However, in Ragge, the Court took note that there, the defendants' IME witness had filed a declaration with the Court setting forth the nature of the exam "...including the type of the tests he may choose to administer." (at p. 609). In this case,

the plaintiff seeks not much more than the Court recognized had already been provided in Ragge.

Of the various cases relied upon by the defendants, only one involved a minor to be examined such as purposed in this case.  In Doe v. District of Columbia, 229 F.R.D. 24 (D.DC. 2005) the Court recognized that a minor fragile plaintiff should not be unnecessarily subjected to a mental exam.  There, the Court held that the exam would take place since there was no "...showing that harm would result from submitting him to an IME." (at p. 28).    In this matter the potential for further harm has been demonstrated by Dr. Kaye's report (Exhibit No. 5).

Once the plaintiff has called into question the safety of an exam or demonstrates the exam is prima facie potentially harmful, the burden of demonstrating its safety falls on the parties requesting the exam.    Pena v. Tromp, 163 F.R.D. 352, 353 (D. Col. 1995).   Here, the plaintiff has demonstrated the potential harm of the exam. The defendant should describe generally the nature and extent of the exam, and the written tests that they propose to compel the minor child to submit in order that the safety of such unidentified tests can be properly evaluated by both plaintiffs' medical personnel and this Court.

In the present case, as shown by Dr. Kaye's letter concerning the proposed exam (Exhibit No. 5) such potential harm has been demonstrated.  While the plaintiffs agree that the defendant should be permitted a reasonable examination, a seven (7) hour exam of undertermined nature, with unidentified tests, in a location over 100 miles from the plaintiff's home, in an unfamiliar setting, has been shown to be potentially further traumatizing.

B.    **Plaintiff's Right to Support During the Exam**:  The plaintiff requests the support of either her mother, or, as suggested by Dr. Kaye, Dr. Kaye's presence during

the exam. This request is made with the understanding that both of such individuals would have already been instructed, and would be under strict direction by this Court not to comment or interfere with the exam, except for the purpose of insuring that the minor plaintiff be given whatever breaks or recovery time during the examination to make sure that she is not further traumatized.[7]

While the defendant has cited numerous cases, which have denied such the presence of an attorney or supporting medical professionals, numerous other courts, including Delaware Courts, have recognized the appropriateness of such support during a psychiatric exam. While several courts have acknowledged the right of an attorney to be present during a psychiatric exam, Carl v. Employer's Insurance of Wausau, 254 N.W.2d 255 (Wisc. 1997)(appropriate for plaintiff's attorney to attend a psychiatric examination to provide assurance and confidence); Byrd v. Southern Prestressed Concrete, Inc., 98 So.2d 455 (Fla. D.C. Ct. App. 2006)(Plaintiff was entitled to the presence of an attorney at his psychological examinations), the plaintiff acknowledges, as will be shown subsequently, that Delaware Courts facing this issue have not allowed attorneys to be present, and plaintiff does not specifically request the right of the minor child's attorney to be present at the examination.

However, numerous courts, including Delaware courts have allowed the presence of medical support to a plaintiff during a psychiatric exam. Gray v. Victory Memorial Hosp., 536 Nys.2d 679 (1989)(Plaintiff had a right to their own psychiatrist presence and to observe plaintiff's mental examination); Lowe v. Philadelphia Newspapers, Inc., 101 F.R.D. 296 (E.D.Pa. 1983)(Plaintiff's psychiatrist or other medical

---

[7] It should be noted that during the minor child's deposition the child needed, and defendant's counsel graciously acquiesced, in the plaintiff's requests for such breaks, when she became physically ill. (Depo. Nancy Doe, pp. 7, 15,23,25, 27; Exhibit No. 1)

expert of plaintiff's own choosing could be present during the examination to take notes and to observe, but not allowed to advise plaintiff during the examination).

Delaware Courts have faced these issues twice, and have found in favor of such medical support during a defense exam. First, this Court, in Warrick v. Brode, 46 F.R.D. 427 (D.Del. 1969) acknowledged that in the Courts of Delaware an attorney is not permitted to be present at a IME. However, the Court did allow a plaintiff being requested to submit to such an examination to have her own physician present during the examination. More recently, the Delaware State Courts have faced this issue in Rochen v. Huang, 558 A.2d 1108 (Del. Super. 1988). There, patients complained that their treating physician had sexually abused them, and made claims of psychological injuries. The Court recognized that, although the plaintiffs there did not have the right to have their attorney present, "...the emotional state of the plaintiffs justify some additional safeguards." (at p. 1109). The Rochen Court found the reasoning of Lowe v. Philadelphia Newspapers, Inc., supra, to be persuasive, thus, as in Lowe and Warrick, the Rochen Court permitted the plaintiffs to be accompanied by healthcare practitioner of their own choosing during the exam (at p. 1110). Further, the Court felt that a three (3) hour limitation upon the exam was reasonable. (at p.1111). Finally, the Court directed that any examination of the plaintiffs to be electronically recorded (at p. 1111), in order to avoid later confrontation over exactly what occurred during the examination.

## CONCLUSION

For the reasons cited herein, the fragile nature of this minor child, and the as of yet undisclosed nature of proposed seven (7) hour exam, the plaintiffs would request that this Court, pursuant to Rule 35(a), require that the "...time, place, manner, conditions..." of the purposed defendants' forensic psychiatric exam be conditioned upon the following:

1.     The evaluation take no more than three (3) hours. (amount of time allowed by the Court in <u>Rochen</u>, and twice the length of examination conducted by Dr. Kaye).

2.     Any proposed written testing be identified, without giving the precise questions, in order that the potential traumatizing effect of the test be determined by the minor child's medical personnel.

3.     The plaintiff be allowed to have medical personnel, of the choosing of her mother, or her mother to be present during the exam to provide emotional support, observe the exam, and to identify any traumatic effect of such exam.

4.     The evaluation take place, as offered by Dr. Kaye, in his office, allowing Dr. Kaye to be present.

5.     Allow the plaintiff to take reasonable breaks during the course of the exam.

Respectfully Submitted,


_____/s/ Gary W. Aber_____
GARY W. ABER (DSB #754)
702 King Street, Suite 600
P.O. Box 1675
Wilmington, DE  19899
(302) 472-4900
Attorney for Plaintiffs

DATED:  March 17, 2008

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


JANE DOE, as the Natural Guardian )
of NANCY DOE, a Minor, MARY DOE, )
a Minor, and SUSAN DOE, a Minor, )
                                     ) C.A. No. 05-CV-00424 SLR
            Plaintiff,     ) Trial by Jury Demanded
                                     )
 -vs-                               ) SEALED TRANSCRIPT
                                     )
CAPE HENLOPEN SCHOOL DISTRICT, )
DANE BRANDENBERGER, JANET MAULL, )
and CINDY CUNNINGHAM,        )
                                     )
            Defendants.    )

         Deposition of NANCY DOE taken pursuant to
notice at the Epworth Methodist Church, 20 Baltimore
Avenue, Rehoboth Beach, Delaware, beginning at 10:00 a.m.
on December 10, 2007, before Julianne LaBadia, Registered
Diplomate Reporter and Notary Public.

APPEARANCES:

         GARY ABER, ESQ.
         ABER, GOLDLUST, BAKER & OVER
           702 King Street - Suite 600
           Wilmington, Delaware 19899
           For the Plaintiff


         DAVID H. WILLIAMS, ESQ.
         MORRIS JAMES, LLP
           500 Delaware Avenue - Suite 1500
           Wilmington, Delaware 19899
           For the Defendant

 ALSO PRESENT: Jane Doe, Susan Doe

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com



WILCOX & FETZER LTD.
Registered Professional Reporters



7

1      A.    Yes.

2      Q.    Was there discussion of the book, in addition

3  to simply reading the book?

4      A.    Yes.

5      Q.    How is it that you recall that the reading of

6  the book progressed to page 33?  What is it that enables

7  you to recall that particular page?

8      A.    I just remember reading up to that.

9      Q.    What do you recall, apart from just reading the

10  book aloud, what do you recall about the discussion of

11  the contents of the book?

12      A.    Can we take a break, please?

13      Q.    Okay.

14          (Brief recess held)

15  BY MR. WILLIAMS:

16      Q.    Before we took a break, I think my question

17  was, apart from reading the text of the book itself, what

18  do you recall about the discussion that occurred in the

19  classroom concerning the book?

20      A.    Well, she was talking about how Osama bin Laden

21  hates America, and how he likes Palestinians and they're

22  the enemies of America, and she also said Christians went

23  to Afghanistan, to help them, and the Muslims bombed them

24  back.  And this came from her, not the book.

Nancy Doe - Confidential Transcript

15

1      Q.    Some of them?  Do you remember which other

2  ones?

3      A.    I'm not sure, but there were many.

4      Q.    There were many, you say?

5      A.    Yes.

6      Q.    Did most of the Christmas stories she read make

7  you feel uncomfortable?

8      A.    Not all of them.

9      Q.    Is there anything in particular that stands out

10  in your memory about some of these other stories that did

11  make you feel uncomfortable?

12      A.    Can I take another break, please?

13      Q.    Sure.

14          (Brief recess held)

15  BY MR. WILLIAMS:

16      Q.    I think when we broke, I was asking you about

17  the Christmas stories other than "The Legend of the Candy

18  Cane" and "The Best Christmas Present Ever," and I asked

19  you what about any of the other Christmas stories you

20  recall that offended you?

21          MR. ABER:  Objection.  You had been

22  using the word -- do you want an explanation or --

23          MR. WILLIAMS:  Yes.

24          MR. ABER:  You had been using the

Nancy Doe - Confidential Transcript

21

1      A.    I believe the librarian took me to her.

2      Q.    And did you talk to her several times?   One

3  time?

4      A.    I don't remember how many times.

5      Q.    More than once?

6      A.    Maybe.

7      Q.    When you returned to school in February of

8  2004, did Mrs. Cunningham ask you if you would be more

9  comfortable in another class?

10     A.    Yes.

11     Q.    Tell me everything that you remember about

12  that.  When did she ask you that, and where?

13              MR. ABER:   Objection; compound

14  question.

15     Q.    Where did she ask you that?

16     A.    In the classroom, as we were entering the

17  classroom.

18     Q.    And did she whisper it to you, or did she say

19  it loudly?

20     A.    She said it loud.

21     Q.    Who else was present who may have heard it?

22     A.    My classmates.

23     Q.    Do you think all your classmates heard it?

24     A.    Yes.

Nancy Doe - Confidential Transcript

22

1    Q.   Did you respond?

2    A.   Yes.

3    Q.   What did you say?

4    A.   I told her no, I wanted to stay here with my

5 friends.  And she asked me three times.

6    Q.   Three times on that occasion, that day?

7    A.   Yes.

8    Q.   Do you recall what words she used each time

9 that she asked?

10   A.   The first time, she said, would you like to go

11 to a different classroom.  I said no, I would like to

12 stay here with my friends.

13           She said, but wouldn't you like to go to a

14 different classroom?  I said no.

15           And she asked again, and I said no.

16   Q.   Eventually, you did transfer to

17 Mrs. Bataglini's class; is that correct?

18   A.   Yes.

19   Q.   Do you remember when that happened?

20   A.   Towards the end of February and March.

21   Q.   Towards the end of February, beginning of

22 March?

23   A.   Yes.

24   Q.   Did you ask to be transferred to

Nancy Doe - Confidential Transcript

23

1    Mrs. Bataglini's class?

2          A.    No.

3          Q.    Did you agree to be transferred to her class?

4          A.    Can we just take a break, please?

5          Q.    Sure.

6                      (Brief recess held)

7    BY MR. WILLIAMS:

8          Q.    Did you agree to be transferred to

9    Mrs. Bataglini's class?

10         A.    No.

11         Q.    Were you asked by anyone whether you wanted to

12   be transferred to Mrs. Bataglini's class?

13         A.    Ms. Maull.

14         Q.    Ms. Maull asked you?

15         A.    Yes.

16         Q.    Was that in a meeting with your mother?  The

17   one that you described earlier?

18         A.    Yes.

19         Q.    How did you respond to her question,

20   Ms. Maull's question?

21         A.    I didn't want to be transferred.

22         Q.    Do you know who made the decision that you

23   would be transferred?

24         A.    Ms. Cunningham and Ms. Maull forced me to.

24

1      Q.    And you say that they forced you to.  How did

2   they go about forcing you to be transferred to

3   Mrs. Bataglini's class?  What did they do?

4      A.    I didn't have a choice.

5      Q.    Who told you that you didn't have a choice?

6      A.    I felt like I didn't have a choice.

7      Q.    And what is it that made you feel like you

8   didn't have a choice?

9      A.    Ms. Maull and Ms. Cunningham didn't want me in

10   her class.

11      Q.    Let's talk about Mrs. Cunningham.  Apart from

12   what you've described earlier in testimony about asking

13   you if you wanted to transfer to another class, is there

14   anything else she said or did that would lead you to

15   conclude that she didn't want you in her class?

16      A.    When she asked me two, three times.

17      Q.    Anything in addition to that?

18      A.    No.

19      Q.    And how about Ms. Maull.  What did she do or

20   say that led you to conclude that she was forcing you to

21   transfer to Mrs. Bataglini's class?

22      A.    I don't remember.  I just remember transferring

23   all of a sudden.

24      Q.    After you transferred to Mrs. Bataglini's

Nancy Doe - Confidential Transcript

25

1  class, were there any occasions when you were called

2  names or made fun of by other students in the classroom,

3  in Mrs. Bataglini's presence?

4      A.    Yes.

5      Q.    Do you recall when that was, and what happened?

6      A.    Can I take another break?

7      Q.    Yes.

8                 (Brief recess held)

9                 (Question read)

10                MR. ABER:  Maybe she doesn't

11  understand the question.  Do you understand there's

12  a question pending that you have to answer?

13                THE WITNESS:  Yes.

14  BY MR. WILLIAMS:

15      Q.    Were you called names in Mrs. Bataglini's

16  class?  I think you already said you were, by other

17  students?

18      A.    Yes.

19      Q.    And do you think that Mrs. Bataglini heard

20  these statements made by other students?

21      A.    No.

22      Q.    Did this happen once, or more than once?

23      A.    More than once.

24      Q.    What kinds of things do you recall students

Nancy Doe - Confidential Transcript

27

```
1       Q.    Who were they?

2       A.    Jackie.  Brooke, Maddie, Morgan.  And there

3   were even some people that I didn't know who came up to

4   me.

5       Q.    Now, where did this take place?  Was it at

6   recess?  In the hallways?  Where did it happen?

7       A.    Recess and lunch.

8       Q.    Did it occur in the presence of a member of the

9   teaching staff, or some other employee of the school

10  district?

11      A.    No.

12      Q.    And is this something that happened -- how

13  frequently?

14      A.    Almost every day.

15      Q.    Did you report this to someone, as each event

16  happened?

17      A.    Can I take another break?

18            (Brief recess held)

19            (Question read)

20  BY MR. WILLIAMS:

21      Q.    When you were teased or taunted by other

22  students during recess or at lunch, did you tell Heidi

23  Quillan about it, or did you tell anyone else that worked

24  in the district?
```

Nancy Doe - Confidential Transcript

28

1       A.   Yes.  And Dr. Brandenberger.

2       Q.   When did you tell Dr. Brandenberger?

3       A.   We had a meeting with him.

4       Q.   And your mom was present?

5       A.   Yes.

6       Q.   Do you remember who else was present?

7       A.   Ms. Maull.  And Ms. Quillan.

8       Q.   And what did you tell Dr. Brandenberger?

9       A.   I don't remember exactly.

10      Q.   Do you remember generally what you told him?

11      A.   I told him I was being teased a lot.

12      Q.   Did you describe the nature of the teasing?

13      A.   Yes.

14      Q.   Did you talk to Dr. Brandenberger about that

15   just one time, or were there other times that you talked

16   to him about it, too?

17      A.   I think it was just one time.

18      Q.   And you talked to Heidi Quillan about being

19   teased, as well?

20      A.   Yes.

21      Q.   Did you talk to her more than once about that

22   subject?

23      A.   Yes.

24      Q.   Did you talk to Mrs. Bataglini about it?

Nancy Doe — Confidential Transcript

31

```
 1          Q.    I'm going to hand you a copy, it's not a
 2   particularly good copy, but a copy of a handwritten note
 3   that your attorney provided to me, I believe.
 4                (Nancy Doe Exhibit 1 marked)
 5   BY MR. WILLIAMS:
 6          Q.    Can you identify this?
 7          A.    This is a note my former friend gave me.
 8          Q.    Who is that former friend?
 9          A.    Brooke Speaker.
10          Q.    The first name is what?
11          A.    Brooke Speaker.
12          Q.    And when were you given this note?
13          A.    After Ms. Cunningham asked me to leave the
14   class.
15          Q.    And you describe -- is it a her?
16          A.    Yes.
17          Q.    You describe her as your former friend.  Did
18   something happen that caused her to become a former
19   friend?
20          A.    Yes.
21          Q.    What happened?
22          A.    The first day that I transferred to
23   Ms. Bataglini's class, at lunch, I waved hi, because our
24   tables are next to each other, and she just ignored me.
```

1    And made faces at me.  And so did all my other friends

2    that were sitting next to her.

3         Q.    And that would have included which other

4    friends that were sitting next to her?

5         A.    Morgan, Jackie, there was another Jackie.

6         Q.    This note says, "You're gonna be board,"

7    b-o-a-r-d.  What was your understanding of what that

8    meant?

9         A.    I guess that I would be bored in

10   Ms. Bataglini's class.

11        Q.    And do you think that that's what she intended

12   to say, and she misspelled bored?

13        A.    Yes.

14        Q.    And at some point towards the end of the 2004

15   school year, were you home schooled?

16        A.    Yes.

17        Q.    Do you remember the name of the first

18   instructor who you met with to provide home schooling?

19   Was it Linda Williams?  Does that sound familiar?

20        A.    Yes.  Yes.

21        Q.    And did she come to your home or did you meet

22   her somewhere?

23        A.    I met her at the library.

24        Q.    Did you encounter any problems with the home

33

1    school instruction that Linda Williams provided to you?

2        A.    Yes.

3        Q.    What was the problem?

4        A.    It's kind of hard to recall today.

5        Q.    Is it something she said or did, or some

6    subject that she covered during the instruction?

7        A.    Yes.

8        Q.    And what was it that bothered you?

9        A.    I don't remember.

10       Q.    Did she ask you to read "The Diary of Anne

11   Frank" as a part of the instruction?

12       A.    Yes.

13       Q.    Did that cause you to be uncomfortable?

14       A.    Yes.

15       Q.    And why was that?

16       A.    I didn't want to hear any more bad stuff, and

17   killing and -- just that whole subject.

18       Q.    The subject of war, or ethnic or religious

19   conflict?  Is that a fair statement?

20       A.    Yes.

21       Q.    And was there a point, then, when a Mrs. Morton

22   became your home school instructor?

23       A.    Yes.

24       Q.    Was that at your request, or at your mother's

# EXHIBIT 2

## Neil S. Kaye, M.D., P.A.
Stoney Batter Office Building
5301 Limestone Road
Suite 103
Wilmington, Delaware 19808
302-234-8950 office • 302-234-8984 fax • nskaye@aol.com • www.courtpsychiatrist.com

- Distinguished Fellow of the American Psychiatric Association
- Diplomate of the American Board of Psychiatry and Neurology with Added Qualifications in
Forensic Psychiatry and Geriatric Psychiatry

# Forensic Psychiatric Report

Date of Report: 04/17/07
Name: Abdelsalam, Fatima
Address: Box 483, Bethany Beach, DE 19930
Phone: 302-539-3555
SS#:
DOB: 2/11/1994
Age: 13
Marital Status: Single
Living Situation: Lives with mother, 3 sisters and 1 brother.
Referred by: Gary Aber, Esquire

Disclaimer: I explained the nature and purpose of my interview. Ms. Fatima Abdelsalam and her mother were told that the contents of the examination would not be confidential, as a report would most likely be written which would be available to both sides in the litigation. They were told that participation was strictly voluntary and that any or all questions need not be answered. They appeared to understand this warning and asked appropriate questions. They agreed to the interview and cooperated.

Structure of Examination:

The following were used in reaching my opinions in this case:

1. Seen in office for 90 minutes on 2/23/07 and met with mother afterward
2. Records of Terri Tipton, LCSW
3. Complaint
4. Records of Barry Goldstein, MD
5. Summary of complaint by Heidi Quillin
6. Note of Kim Gallagher, MD

History:

Complaint Summary:

Enrolled in Cape Henlopen School District. During the 2001-2002 December holiday period, there were Christmas related celebrations in the classroom. In an effort to provide her children with a sense of self-worth and self-esteem, Mrs. Abdelsalam offered to bring traditional Muslim baked goods usually made at Ramadan, to the class. The teacher, believing that such a presentation was inappropriate aided, abetted, and/or encouraged parents of other children in the class to contact Mrs. Abdelsalam in an effort to persuade, and/or coerce her into not making any presentation with regards to her child's observance of Ramadan. One or more of the school personnel agreed to, consented to, acted in concert with, and/or approved of the community pressure directed toward Mrs. Abdelsalam in order to prevent her from providing any presentations concerning Ramadan to the class. Also, during the 2000-2001 school year, numerous parents of children attending Rehoboth Elementary School complained to administrators of the school district of certain activities deemed inappropriate of the teacher. In Mrs. Abdelsalam's case, the complaints were attributed to religious beliefs, whereas no such attribution was made regarding other parents who expressed similar concerns.

On 9/11/02, the first anniversary of the WTC bombing, the personal property and home of the plaintiffs were vandalized, the result of which caused Mrs. Abdelsalam to express concern to Ms. Maull, for her children's physical safety, and expressed those concerns in writing both to Ms. Maull and each of her children's teachers.

In 9/03, Ms. Cunningham began instructing 4th grade at Shields Elementary School. Plaintiff was a student in this class. During lessons, students were informed "Muslim's believe the Koran, teaches war and hatred."; Muslim's believe that people who do not practice Islam are evil"; "Christians went to Afghanistan to help people, and in return, Muslims bombed the Christians"; Islamic extremists hate America"; Islamic terrorists believe the Koran tells them to fight countries like the United States". Other materials during the class presentation equated Muslims to terrorists and disparaged members of that religion. Ms. Cunningham specifically pointed out among other things that Mrs. Abdelsalam dressed as did oppressed women living in Afghanistan and was "one of them." As a result of the lessons taught by Cunningham, the children in that classroom would make derisive comments, noises, and gestures toward Fatima.

On 9/11/03, Mrs. Abdelsalam contacted Ms. Maull to express concerns about the unbalanced nature of the lessons and was told that Ms. Maull would speak with Cunningham. Thereafter, Cunningham continued with the same or similar materials equating Muslim's to terrorists. Mrs. Abdelsalam also expressed her concerns directly to Cunningham who also assured her that those lessons would not be used in the future. Nonetheless, Cunningham persisted in describing Muslims as terrorists to the 4th grade class attend by Fatima.

Mrs. Abdelsalam attempted to contact school personnel on 9/17/03, 9/25/03 and 9/29/03, but never received a response. During December of 2003, Ms. Cunningham included lessons of a religious nature concerning Christmas and provided personal books concerning Christmas, including books of a religious nature. These teachings were contrary to the religious beliefs of Fatima and caused confusion and mental distress, feelings of being ostracized and a desire not to attend school.

In 1/04, Mrs. Abdelsalam met with Ms. Maull and was assured that anti-Muslim materials had been removed from the curriculum when in fact they had not. At a 1/22/04 meeting of Mrs. Abdelsalam, Ms. Maull, and Ms. Cunningham, Ms. Cunningham stated that Fatima should be removed from her classroom and that there was no reason why Ms. Cunnngham should not have been reading religious books during the Christmas holidays. During that meeting, it was suggested by Mrs. Abdelsalam that Fatima make a balanced presentation explaining the Muslim religion to the class, to boost her self-esteem. It was expressed that such an action would be inappropriate and "open a can of worms." As a result of that meeting, Ms. Maull agreed to attempt to facilitate improved relations between Ms. Cunningham and Mrs. Abdelsalam and her children.

01/29/04  Fatima returned to the class and Ms. Cunningham, in front of other children, told her she should transfer out of her class. When Fatima protested that she wanted to stay in the class with her friends, Ms. Cunningham again insisted she should transfer. At that point, other children began taunting her with "get lost" "we don't want you here" "no loser Muslims allowed."

01/30/04  Mrs. Abdelsalam took Fatima to Ms. Maull's office regarding Ms. Cunningham's actions and was told that she didn't have time to deal with the situation and would do nothing other than to assist in a transfer to a different classroom. During this meeting, other school personnel were heard to comment: "Looks like we are in Saudi Arabia today."

During the first week of February, 2004, Ms. Cunningham began a course of ostracism of Fatima while at the same time, other students began continually harassing and telling her that "Ms. Cunningham told you to leave...no loser Muslims allowed." Ms. Cunningham informed her class that Fatima had been transferred out.

02/12/04 following complaints of Amani (Fatima's younger sister), Mrs. Abdelsalam contacted school personnel to inform them that male members of Amani's class were approaching her and taunting her, by simulating urinating on her. On 2/13/04, Amani was punched in the face by the brother of a classmate of Fatima's who told her, "I hate you." The same day, Amani's classmates continued to simulate urinating on her. Mrs. Abdelsalam met with Dr. Brandenberger concerning the verbal abuse was told that all classroom materials were appropriate.

On 2/19/04  Mrs. Abdelsalam and her daughters met with Dr. Brandenberger and Ms. Maull to personally describe the persecution they faced. Fatima tearfully tried to explain

that Cunningham had taken her religion away from her. Dr. Brandenberger told her to go home for the day. Dr. Brandenberger told Mrs. Abdelsalam that Ms. Cunningham had not acted improperly and that Amani had not been struck in the face.

On 2/20/04, when Mrs. Abdelsalam attempted to consult with school personnel concerning the situation, including the school counselor, Ms. Maull demanded that parent leave the premises and threatened to call the police to have her removed.

On 2/26/04, the first day that Fatima was assigned to a new classroom, her former classmates taunted her and informed her that they could no longer speak with her, resulting in her becoming hysterical.

In spite of specific complaints that Amani was harassed by a specific student, the school personnel insisted the two students work together on school projects. During the last weeks of February 2004 and first week of March 2004, Fatima had become so depressed and upset that she was unable to attend school. Upon her return, 3/5/04, children of both her former class and new class would taunt her as a "loser Muslim." As a direct and proximate result of the actions of the school personnel, the harassment of Fatima and Amani, they began private psychotherapy on 3/8/04.

During March 2004, harassment continued, on the basis of her religion and perceived nationality. Fatima lost all desire to attend school and became fearful for her wellbeing. Later that month, Ms. Maull wrote to Mrs. Abdelsalam saying that unless Fatima returned to school, she would be regarded as truant and administered a failing grade.

After the March and April 2004, meetings, Amani was harassed by her classmates, told she was ugly and was identified as a Muslim because she did not go to church and had an ugly name. Amani, like Fatima, became distressed, upset and could not attend school.

As a direct and proximate result, Fatima's physician prescribed homebound instruction, noting that she was suffering from severe depression, anxiety, and panic attacks brought on by her school environment. During May 2004, Fatima began homebound instruction with a teacher, who despite parental requests, continued to discuss matters such as war, ethnic hatreds, and religious and ethnic wars. Fatima's therapist contacted school personnel and stressed that such topics were harmful to Fatima's emotional health. After this contact, the homebound teacher failed to appear for regularly scheduled lessons. When Mrs. Abdelsalam called school personnel to arrange a tutor, she was told to "stay away from her" while she was being instructed.

Beginning 5/27/04, school personnel approved a new homebound instructor for Fatima, but limited this to 5 hours/week for 2 weeks, despite requests from the instructor that additional time was needed during the summer to catch up on missed work.

On 6/3/04, authorization for 3-5 weeks of summer homebound instruction was granted. During Summer 2004, Mrs. Abdelsalam attempted negotiations with school personnel in

order to assure that 2004-2005 would not subject children to derogatory comments, ridicule, and harassment as had occurred in 2003-2004 academic year. School personnel failed to provide any assurances or to make provisions to prevent such conduct.

---

Record Summary:

05/17/06 Goldstein. Meds: Lexapro 10 mg started around January. Ever since what happened in 4th grade (currently in 6th), I felt very sad. I don't think it's working very well. Dropped out of 4th grade due to teacher being prejudice re: Muslims and Arabs and why 9/11 happened, then she proselytized and tried to convert Fatima. After that, all her friends turned against her. Dropped out. Homebound. Then, moved to Ocean View and she's been able to return to school. Dad couldn't cope, got depressed and left. Seeing Terri Tipton for therapy. This year, incidents with a couple of teachers who acted inappropriately (to say the least) re-traumatized her. Call her Jesus hater. Gallagher put her on med. Headaches and stomach aches. No known family history of psychiatric problems other than dad's recent depression. Flashbacks of school incidents. Hypervigilance in school. Mood: too sad but good days. Decreased concentration. Low energy, no fun. MSE: sad, anxious, constricted affect. 12 year old girl with some improvement of her symptoms of depression and PTSD related to school incidents described above. No side effects. Dx.: Major depression, recurrent, PTSD. Consider more supportive school placement.

05/22/06 Goldstein. Mother called. Fatima wants to stop medication. Taper and close supervision with follow up discussed.

06/19/06 Goldstein. Canceled.

07/03/06 Goldstein. Mother called. Fatima crashed off meds. Felt worse than ever. Restarted med.

07/10/06 Goldstein. More background. In 4th grade, when stuff going on, gave up her faith, then found her way back. Hard for her when not accepted by others. Back on medicine. Made PCP aware she crashed off the med. Needs counseling re: her religion. Struggling.

07/31/06 Goldstein. "I'm really nervous about starting school and wonder if you can write me a note to help me get into Sussex Academy." 7th grade. On the waiting list currently. Discussed importance of regular counseling. Used to see Terri Tipton. I called and left message last week. She feels a little better back on Lexapro 10 mg but not enough. Increase to 15 mg?

08/28/06 Goldstein. Med check.

10/09/06  Goldstein.  Took Lexapro 15 mg for a while, didn't feel any change and went back to 10 mg.  Mood now-normal tone.  Got into School of the Arts.  Somewhat better.  Trouble with 1 teacher-book that talks about how Jews and Muslims are, but "my mom met with them."  Don't think we should be learning about Crusades.  Mom-you can read anything but what's critical is the discussion.  Meds-Lexapro 10 mg.  No side effects, Overall, better mood and school experience but some ongoing problems.

11/07/06  Goldstein.  Mad that book on Medieval Renaissance was from Christian point of view.  Mom reports that Fatima had a panic attack and didn't go to school for a couple of days and e-mailed a letter to the Principal.  Principal offered her to be out of class but she wanted a more open discussion.  Went back to Terri Tipton.

12/10/06  Tipton.  First seen 3/8/04.  She has been seen for 45 sessions over the past 2.5 years, including 1 family session, 5 sessions with at least 1 sibling, 5 school meetings and 34 individual sessions.  Referred following significant changes in her behavior and intense fear and anxiety attending school.  Mom felt this was triggered by several incidents at school in which Fatima's religious beliefs and identity were compromised.  Fatima felt these incidents created an atmosphere surrounded by fear and rejection from her friends and teachers.  She reports being teased and shunned by people with whom she had been friendly, due to her spiritual beliefs.  Initial diagnosis was Adjustment Disorder with Mixed Anxiety and Depression, however, as treatment progressed, her nightmares, avoidant behavior, intrusive thoughts, irritability and difficulty concentrating were seen as more consistent with Post Traumatic Stress Disorder (PTSD).  She continues to struggle with overriding fear of rejection from friends and teachers.  She has benefited from assertiveness training and learning how to address her emotional state to prevent anxiety and avoidant behavior.  She has been in and out of therapy as symptoms return and changes in her life have occurred.  Continues to struggle with fear of rejection from friends often from not letting others get close to her.  Difficulty sleeping and school attendance is sporadic due to anxiety driven avoidant behavior.  Fatima feels responsible and guilty over causing significant family stress that led to her parents separating and her family relocating to a different school district. During the past year, she was placed on antidepressant medications to help with the hopelessness, anger, and sadness she feels on an ongoing basis.  It can be difficult to assign causation to psychological/emotional struggles.  In this case, by self report, parental report and school report, Fatima was a popular and happy child prior to 12/03. Her problems began this school year and she connects them with several school incidents that "caused everyone to hate me."  She has lost her friends, questioned her cultural identity, her spiritual beliefs and felt responsible for many changes in her family.  Fatima does connect her fears in school with the fear she felt when her family was threatened and their property vandalized following the 9/11 attacks.  It is difficult to assess the impact this may have had on the trauma she experienced during the 2003-2004 school year.  Since 12/2003, her life and that of her family have drastically changed.  She continues to struggle attending school due to fear and anxiety that her teachers and peers will reject her because of her Muslim beliefs.  She struggles every day with relearning how to not feel guilty about the ongoing struggles that face her family.  It is expected that she will continue to enter in and out of therapy on an as

needed basis. She has been seen approximately 10 times over the last year and it is estimated that this will continue for the next year. She may find that she will need to return to therapy as it is likely her depressions will be an ongoing struggle for Fatima.

02/12/07 Gallagher. Diagnosed with situation depressive disorder and panic attacks. It is imperative she be protected from religious persecution and/or ethnic discrimination. I would recommend a "liaison" be available for Fatima should she feel threatened.

02/23/07 Kaye, Evaluation. "My teacher, Ms. Cunningham at first seemed nice. But on September 11th (2003), I saw her true colors. She put us in groups and read us a very hateful book (Remembering September 11th?) about Christians going to Afghanistan and how the Koran teaches war. I went home and told my mom and she was shocked. She called the principal and told her what happened and Ms. Maull said she would take care of it. But, the next day, we read it again. All that bad stuff about Islam, that what we read. My classmates questioned me about it and asked if I was related to Osama bin Laden. Of course, I said no, but I felt embarrassed and didn't know what to think. I came home and told my mom again and she had a meeting with Ms. Maull and Ms. Cunningham." "That's when I started getting depressed. I stayed home a while. Ms. Cunningham wasn't very supportive." "In December, Ms. Cunningham brought Christmas books and told us that she had 100's of Christmas books and that we would be reading at least 2 every day. One day she brought about the legend of the Candy Cane, and how the stripes represent the blood of Jesus and how his blood will save us. She told us to look at the candy canes and to note they were in the shape of a "J" for Jesus and that the stripes were his blood and we would be saved by him. I don't believe that. All my classmates started questioning me about this and I stayed home and I really became depressed." "Ms. Cunningham told me to leave the classroom, she kept asking me if I wanted to transfer classrooms, but I said no. But, she said it three times in front of everyone. I went home and I just cried a lot. I had to transfer classrooms because I couldn't be with this teacher." Later, she learned that her former classmates in Ms. Cunningham's class were told that they couldn't talk to her anymore. "I went home in the middle of the school day and just cried a lot. All my friends turned against me." "They called me a loser Muslim and asked why I was there and said they didn't want me back in their class (Cunningham's room)." "I think it's really horrible, because now my dad doesn't live with us anymore. He couldn't take the stress of what was happening. He was born and raised in Palestine and now he lives in Texas with his brother. We had to move and go to a new school in Bethany." "I went to one meeting with Ms. Maull and my mom, and Ms. Maull and Dr. Brandenberger denied everything and basically forced us to move." "I think Ms. Cunningham, Dr. Brandenberger and Ms. Maull are all prejudiced. I stopped being Muslim for a while, when the Christmas activities were happening and that affected our family too. Then, my father got depressed and just walked out."

She started seeing a counselor for symptoms of depression and anxiety. She started with Terri Tipton, LCSW for therapy. "I saw her before we moved. But, then we had to move. She helped me try to get back in school because I was home schooled for the rest of my 4th grade year. She tried to help me feel better." "At first I didn't think she

understood, but then she started to understand what I was going through. I feel like no one understands. I feel hopeless. I moved and they got away with it. Everyone's being taught bad things and dishonest things about Islam." She attended school for 5th & 6th but was in a different school and district. She says she was in Southern Delaware School of the Arts but had to change again due to prejudice there as well. "We read a book about Christians and heathens and the Crusades. They called Muslims heathens. It was bad." "They want the chorus to sing a song that is hateful and mocks Muslims and I couldn't do that. It's a song by Queen about Muslims killing a man. Once again, the chorus teacher wouldn't listen. She gave us a whole list of why this is a good song. She doesn't understand why this is a bad song. She's teaching all these kids that Muslims are bad people and are killers. It's 7th & 8th grade singing this. The principal, she didn't do anything about it." "There were bad things I had to go through with. There was ballroom dancing and the same teacher who made us read the book on the Crusades made us dance. My religion says I can't dance (with a boy) or have a boyfriend and she made me. I danced with a girl and my mother had a meeting with the chorus teacher and the Principal." "That was my last day at Southern Delaware, and I went home crying." "I found out my Language Arts teacher is just full of hate. She'll do anything to get us in trouble and called the police on us."

"I just can't trust anybody anymore, and it started with Shields Elementary. I don't really have any friends. I just have people I go to school with. I think someday they'll all turn against me. "I was started on Lexapro about a year ago. I have panic attacks sometimes." Describes panic attacks with shortness of breath, crying jags and depression. Has headaches and stomach aches that she can relate to anxiety and fear. Fidgets and has poor/limited eye contact. Feels faint and weak at times. Nightmares approximately 4 times/week and dreams with content of people coming to kill or her family. Had a vivid dream of her face burning and of Ms. Cunningham laughing at her while someone was killing her. Sees herself being shot by a man with a gun in her dreams. "I feel scared a lot of the time." Avoids contact with classmates outside of school because "I can't trust anybody. I even avoid doing fun things with my siblings." Tends to stay to herself, whereas she describes her prior love of doing craft projects with her sibs. "I'm just sad all the time, I'm always feeling sad and sometimes I just start crying for no reason, and I don't know why."

Describes intrusive, unwanted images and memories of her time in 4th grade, especially when there are reminders or triggers. She cites Ms. Cunningham as a clear trigger for her PTSD symptoms. "What she did was as bad as committing murder and she shouldn't get away with it." "The candy cane lesson was the worst, because that's when I started not being Muslim any more. She wasn't making us pray, but she kept telling us to look at the stripes and to remember that it represented his blood. It made me mad; I don't think his blood will save me. In my religion it's sacrilegious to think Jesus's blood will save us. I feel like Ms. Cunningham killed me on the inside." "They should have never read that book or the September 11th book either." "She witnessed them teasing me and didn't do anything about it. She knows I didn't celebrate Christmas and she made us read them." "I just think Ms. Cunningham is full of hate and prejudice against all Muslims and that's why she acted that way toward me." "I think they all tore my

family apart. We're not together anymore. We're not happy anymore. We're going through a rough time. My mom and dad always loved each other, but he couldn't stand up to it. He went through the same thing, but he couldn't stand up to it or he would have been killed by the Israeli's. He wasn't allowed to go to school and was tortured by the Israeli's. He doesn't really know how to stand up for himself. He doesn't feel that he fits in in America." She acknowledges that her parents disagreed about staying in the US and that her father wanted to move back to Palestine and that her mother did not want to move, having herself been born in the US.

Appetite is fair, weight is stable. Sleep is disturbed with nightmares, sleep latency and middle of the night awakening. She is doing okay academically, but missed a lot of school; estimates she missed 2 months this year already. She is an A/B student but says she got a 75 in Music because she wouldn't sing Bohemian Rhapsody (Queen song mocking her religion) and feels that she was downgraded for refusing to sing this song.

Says there was one other Muslim family in the school district but that they were not really practicing and so they were not subject to the same type of harassment.

Psychiatric History:

Denies any history of abuse, physical, sexual or emotional (other than school), rape or incest.

Denies any prior psychiatric or psychological evaluation or treatment.

Family History:

Mother Dina Odatella, 32. Father Mahmoud Abdelsalam 41. Sisters Basima 11, Amani 10, Sara 6. Brother Sufyan 7. No known family history for anxiety, depression, mental illness, emotional problems, alcohol or substance abuse.
Social History:

In 7th grade at Selbyville Middle School. Lives with mother and sibs.

Medical History:

NKDA. No active medical problems.

Substance Abuse History:

Denies

9

Medications when initially seen:

Lexapro 20 mg qd

Mental Status when initially seen:

Ms. Fatima Abdelsalam was found to be alert and oriented in all spheres. Appeared stated age. Grooming was casual. Hygiene was good. Makes fair eye contact. Social expression was appropriate. Posture was fidgety. There were no other unusual mannerisms, movements, or tremors. Was cooperative and agreeable during the interview. Speech was soft, fluent, coherent of normal rate, tone and flow. Thoughts are organized and coherent and goal directed. There was no evidence of paranoid ideation, loose association, tangentiality, circumstantiality, ideas of reference, illusions, delusions or hallucinations in any of the 5 spheres. Denies micropsia, macropsia, jamais vu, deja vu, or ediatism. Mood is depressed. Affect is congruent and appropriate. Sleep is disturbed with latency and MON waking. Appetite is fair. Attention and concentration are intact. Memory is intact for immediate, recent and remote events. Needed 1 trial to immediately recall 4 words and at 5 minutes could remember 4/4. Denies suicidal ideation, plan or intent. Denies homicidal ideation, plan or intent. Serial 7's: 100-93-86-79-72-65-58. Was able to spell World forward and backward. Abstracts simple proverbs and concepts. Presidents: B-C-B. Insight is good. Judgment is good. Intelligence is estimated to be in the average range.

Physical Examination:

Kim Gallagher, MD

Formulation:

Ms. Fatima Abdelsalam was seen for evaluation. In addition, her records as noted above, were reviewed. She clearly meets the criteria for Post Traumatic Stress Disorder (PTSD), having suffered threatening and shaming experiences that she clearly perceived as life threatening/altering and as a direct result of these threatening incidents, experiences/demonstrates avoidant behavior, reliving/reexperiencing of the trauma and autonomic arousal. Further, she has shown some generalization of her symptoms, which is not uncommon. Her combined symptoms of depression and anxiety are characteristic of the PTSD, and persist despite being on active medication for mood and anxiety, and her engagement in psychotherapy, to help her cope, manage, deal with and process her stressful experiences. It is very clear that she experienced the 4th grade classroom experiences with Ms. Cunningham as threatening, prejudice and isolating. She was made to feel unwanted and unworthy. She was

10

teased, humiliated, made to question her religion and beliefs, and ostracised. The failure of the school and its staff and administration to protect her from religiously based persecution, caused her to initially try to dissociate from her religion, and left her even further isolated. Their failure to teach and to model tolerance and inclusiveness is a sorry root of prejudice in society today.

My opinion that she carries the diagnosis of PTSD is the same as that reached by Dr. Goldstein, her treating psychiatrist who started her on medication and that of Ms. Tipton, her psychotherapist. That three independent professionals all reached the same diagnosis, speaks volumes regarding the clarity of the Fatima's symptomatology. Further, the ongoing and sustained symptoms suggest a degree of permanency of this diagnosis, and it is to be expected that similar circumstances will rekindle and reopen the psychological wounds she has sustained. Her need for medication and therapy is clear, present, and will be ongoing throughout her life. While I do expect there to be times when she is not in active treatment, she will remain forever at high risk of rekindling the ever smoldering embers of the abuse and persecution she suffered, and will most probably seek out professional mental health at various times in her life. But for the incidents in 4th grade, there is nothing to suggest that she would have developed PTSD, especially at this young age. But for her experiences in 4th grade, there is nothing to suggest she would need professional mental health treatment, including antidepressant and anxiolytic medication and psychotherapy. But for these incidents, she would not have had to change schools, move, and lose the friendship of a peer group she once enjoyed, but who was turned against her by the actions, acts of commission and omission, and behaviors of school personnel. Clearly, for Fatima, the classroom was not a protective, nurturing environment, conducive to learning. Despite her own efforts and those of her mother, she never felt heard or empowered in a manner that could have neutralized the toxicity of the environment. The failure of the school to insist on a separation of Church and State is clearly the basis of her PTSD, and it was reasonable and foreseeable that such a disorder could result from such a position.

Fatima should remain in therapy with a competent psychotherapist and provisions should be made for her to see the therapist for 10-20 visits annually, at an estimated cost of 85.00-150.00/visit, for a 3-6 year duration. She will need to remain on medication for a minimum of 3 years, such as the Lexapro she currently takes, at a cost of 2.00-4.00/day depending on dose and specific medication. It is likely that even when she comes off medication or leaves psychotherapy, that such a hiatus will be transient, and that she will end up back on medications and/or back in psychotherapy (off/on) for at least the next 10 years. A psychiatrist should monitor her medications, with 4 visits/year, at a cost of 150.00-300.00/visit. Annual lab work to accompany the medication should be ordered and will cost about 200.00/year.

All of the opinions expressed in this report are to a reasonable degree of medical and psychiatric certainty.

Diagnosis:

Axis I:      Posttraumatic stress disorder-PTSD
Axis II:     None
Axis III:    See medical above


Neil S. Kaye, M.D., F.A.P.A.

Diplomate of the American Board of Psychiatry and Neurology with added
Qualifications in Forensic and Geriatric Psychiatry

# EXHIBIT 3

Joseph R. Novello, M.D.
NovelloMD.com

Home    Biography    Speaking Events    The Myth of More    Forensic Services    Contact Dr.

# Forensic Services

**Joseph R. Novello, M.D.,** has over 30 years experience in the practice of Forensic Psychiatry. Board-certified in both adult and child/adolescent psychiatry, Dr. Novello provides ethical, fair, and impartial evaluations and testimony in accordance with the standards of the American Academy of Psychiatry and the Law, the American Psychiatric Association, and the American Academy of Child and Adolescent Psychiatry.



Dr. Novello is available as evaluating expert, testifying expert, and consulting expert to plaintiffs, prosecution, and defense in a wide range of civil, criminal, and other forensic matters. Although Dr. Novello's forensic work is focused in the District of Columbia, Virginia, West Virginia, and Maryland, he is available in other parts of the country on a case-by-case basis. Attorneys may contact Dr. Novello for an initial discussion at (202) 362-0115 (Washington DC) or (540) 678-3829 (Virginia).

## Civil cases:

- Personal injury
- Disability
- Workplace issues
- Sexual harassment
- Wrongful termination
- Testamentary capacity
- Employment discrimination
- Pre-employment evaluations
- Psychiatric malpractice
- Child custody
- Parental competence
- Visitation
- Child abuse and neglect
- Parental rights

## Criminal cases:

- Competency issues
- Voluntariness of confessions
- Insanity defenses
- Sex offender evaluation
- Diminished capacity
- Risk assessments
- Mitigating factors
- Sentencing issues

## Other:

- Confidentiality
- Right to refuse treatment
- Commitment
- Informed consent
- Ethical concerns
- Legislative consultation
- Right to treatment
- Special issues re: children

# EXHIBIT 4

LAW OFFICES

# ABER, GOLDLUST, BAKER & OVER

(AN ASSOCIATION OF LAW PRACTICES)

702 KING STREET, SUITE 600

P.O. BOX 1675

WILMINGTON, DELAWARE 19899-1675

GARY W. ABER, P.C.
PERRY F. GOLDLUST, P.A.*
DARRELL J. BAKER, P.A.
SUSAN C. OVER, P.C.
SHAUNA T. HAGAN
SAAGAR B. SHAH
JOANNE A. SHALLCROSS**

(302) 472-4900
TELECOPIER (302) 472-4920

November 30, 2007

* ALSO ADMITTED IN NEW YORK
** ALSO ADMITTED IN PENNSYLVANIA

**HAND DELIVER**
David H. Williams, Esquire
Morris James, LLP
222 Delaware Avenue, 10th Floor
P.O. Box 2306
Wilmington, DE 19899

RE:    Doe v. Cape Henlopen School District

Dear David:

    We are presently trying to finalize the deposition date for the eldest child in this matter. You have also requested a DME of this child by a psychiatrist of your choosing.

    On several occasions I have attempted to determine the nature and extent of any written testing which the psychiatrist will perform. As you have seen, the eldest child is in a very fragile condition, and both her mother, and I concerned about the stress and strain of such psychological testing. I have been able to do some research with regards to certain psychological tests that are often used in litigation, such as an MMPI-2, PAI, and a MCMI-III. All of them seem to, in some respects, open to question, and have been in the past subject to challenge. I think, in the interest of the well being of this child, we should be given an opportunity to know the nature of the tests to be given to determine whether they are appropriate, and whether she should undergo the strain and stress of such testing. I would appreciate it if you would consider these concerns, and let me know what written test your psychiatrist plans on administering.

    Thank you for your kind consideration.

Yours very truly,

Gary W. Aber

GWA/mac
cc:    Ms. Dina Odatella

# MorrisJames LLP

OCT 26 2007

James H. McMackin, III
302.888.5849
jmcmackin@morrisjames.com

October 26, 2007

**VIA HAND DELIVERY**

Gary W. Aber, Esquire
Aber, Goldlust, Baker & Over
702 King Street, Suite 600
Wilmington, DE 19899-1675

Re:    **Jane Doe, et al. v. Cape Henlopen School District, et al.**

Dear Gary,

I write to follow up on our recent phone conversation concerning the evaluation of Fatima Abdelsalem by Dr. Novello. You indicated to me a concern that the evaluations could harm Fatima, and asked that we provide you in advance the nature of the evaluations to be conducted. It is standard procedure for an evaluating physician to not identify in advance the evaluations to be conducted. Among other reasons, identifying the evaluations in advance may lead to coaching the individual to be evaluated. Dr. Novello's evaluation is intended to be a fair and independent assessment of Fatima's purported condition. Deviating from standard procedures, even if the information is intended to be provided only to you and your expert, may jeopardize the fair and independent opinion which we seek. Furthermore, as an experienced psychiatrist, surely Dr. Novello is able to judge for himself which types of evaluations, if any, may aggravate Fatima's purported condition, and we are certain he will conduct his evaluation accordingly.

Additionally, you asked whether there are depositions that have been noticed. The depositions of the minor plaintiffs were noticed for October 31, 2007 commencing at 9:30 a.m. You expressed an interest in deposing Janis Hanwell and Dane Brandenberger. Given the many delays in securing your clients' cooperation in scheduling the depositions of the minor plaintiffs, we are not willing to schedule more depositions of our witnesses until we are afforded the opportunity to depose the minor plaintiffs.

Lastly, please circulate an amended scheduling order. There are numerous deadlines on the existing scheduling order that have passed.

Gary W. Aber, Esquire
October 26, 2007
Page 2

Morris James LLP

      Please contact me with any questions or concerns.

               Very truly yours,

               James H. McMackin, III

JYM/cjh

cc:    David H. Williams, Esquire

1626791/1

# Morris James LLP

James H. McMackin, III
302.888.5849
jmcmackin@morrisjames.com

October 16, 2007

**HAND DELIVERY**

Gary W. Aber, Esquire
Aber, Goldlust, Baker & Over
702 King Street, Suite 600
Wilmington, DE  19899-1675

RE:   Jane Doe, et al. v. Cape Henlopen School District, et al.

Dear Gary:

You asked me to identify the evaluations the expert witness, Dr. Novello, intends to conduct during his evaluation of Fatima.  I am informed it is standard practice for a forensic psychiatrist to not reveal in advance the nature of the evaluations to be performed.  Such disclosure would provide an opportunity to prepare and coach Fatima for the evaluation in such a manner as to possibly distort the evaluation.

You also asked me what is the purpose of interviewing Mrs. Odatella as part of Dr. Novello's evaluation of Fatima.  I am informed it is standard practice for a forensic psychiatrist to speak with a parent when the individual being evaluated is a minor.  Among other things, Mrs. Odatella will be able to provide matters of context, such as social and family history, that a child would not otherwise be able to provide.

Please contact me if you have any questions or concerns.

Very truly yours,

James H. McMackin, III

JHM/jam
cc:  David H. Williams, Esquire

1624182/1

**Sent:** Sunday, October 14, 2007 11:24 AM
**To:** McMackin III, James H.
**Subject:** RE: Doe/Cape

Call me to discuss.  Please let me have the address.


P.O. Box 1675
Wilmington, Del. 19899
(302)472-4900
(302)472-4920(Fax)
The communication contained in this document is intended for the above named recepient only, and may contain legally privileged information.  The receipt and/or use of this document by any person, other than the intended recepient is improper, prohibited, and may be a violation of the law.

-----Original Message-----
**From:** McMackin III, James H. [mailto:JMcMackin@morrisjames.com]
**Sent:** Monday, October 08, 2007 12:39 PM
**To:** Gary W. Aber
**Cc:** Williams, David
**Subject:** RE: Doe/Cape

Gary,

Dr. Novello is available on the following dates at 10 a.m.: October 18, November 1, November 8.

The evaluation will take a few hours with a break for lunch.  It will be composed of some testing, evaluations and meetings with Fatima and Mrs. Odatella, together and separately.  Dr. Novello is holding the dates, so please let me know as soon as possible which date works for your client.  Dr. Novello also indicates that a follow up evaluation may be necessary.  As such, we reserve the right to schedule a follow up visit.

Directions to the office will be forthcoming.

Best regards,

Jim

---

# Morris James LLP

**James H. McMackin, III**

Attorney at Law
jmcmackin@morrisjames.com

500 Delaware Ave., Ste. 1500 | Wilmington, DE 19801-1494
Mailing Address P.O. Box 2306 | Wilmington, DE 19899-2306
T 302.888.5849     F 302.571.1750

www.morrisjames.com

---

This communication may be subject to the attorney-client privilege or the attorney work product privilege or may be otherwise confidential.  Any dissemination, copying or use of this communication by or to anyone other than the designated and intended recipient(s) is unauthorized.  If you are not the intended recipient, please delete or destroy this communication immediately.

# EXHIBIT 5

# Neil S. Kaye, M.D., P.A.

Stoney Batter Office Building
5301 Limestone Road
Suite 103
Wilmington, Delaware 19808

302-234-8950 office • 302-234-8984 fax • nskaye@aol.com • www.courtpsychiatrist.com

• Distinguished Fellow of the American Psychiatric Association
• Diplomate of the American Board of Psychiatry and Neurology with Added Qualifications in
Forensic Psychiatry and Geriatric Psychiatry

Gary Aber, Esq.
Box 1675
Wilmington, DE 19899-1675

03/06/08

Re:  Abdelsalam, Fatima

Dear Mr. Aber:

Ms. Abdelsalam is a 14 year-old young girl who I evaluated last year.  It was quite clear that she met the diagnostic criteria for post-traumatic stress disorder (PTSD), directly related to 4th grade classroom experiences, which for her were threatening, prejudice and isolating. She was teased, humiliated, made to question her religion and beliefs, and ostracized.  The failure of the school and its staff and administration to protect her from religiously based persecution, caused her to initially try to dissociate from her religion, and left her even further isolated

My opinion that she carries the diagnosis of PTSD is the same as that reached by Dr. Goldstein, her treating psychiatrist who started her on medication and that of Ms. Tipton, her psychotherapist.  That three independent professionals all reached the same diagnosis, speaks volumes regarding the clarity of the Fatima's symptomatology.

It is my understanding that the defense in this case is requesting to conduct a defense psychiatric examination.  I believe that this process will be experienced by Ms. Abdelsalam as very negative and may even be further traumatizing.  Her fragile mental state should be taken into account if such an examination is necessary.  Her emotional fragility as evidenced by her extreme anxiety during other examinations was obvious, including needing to take frequent breaks and getting physically sick and vomiting during the examination.  She has a tendency to dissociate under stress and this will further complicate any such evaluation.

General Psychiatry • Psychopharmacology • Forensic Psychiatry • Neuropsychiatry • Geriatric Psychiatry

It would be reasonable and protective to allow her to have emotional support such as her mother or legal counsel present throughout the examination, and to allow her to take as many breaks as needed.  I routinely allow attorneys to be present during independent examinations, a position that is consistent with that of the "American Academy of Psychiatry and the Law."  It would be best for the examination to be conducted in a familiar setting here in Delaware.  I would be willing to volunteer my office and to be present as a silent observer, a role I have had in other similar cases.

Further, I would like to know exactly what testing, if any, will be done during the evaluation, and by whom.  It is not unreasonable to make such a request so that she can have at least some idea of what to expect and her therapist can try to help her to prepare emotionally for what she is being asked to face.

It is no secret that forensic evaluations can be emotionally stressful, especially for a fragile, young girl, who has already been traumatized and forced to question so many of her core beliefs.  Some evaluators are gentle; others intentionally try to stress or break an evaluee.  An assurance should be garnered that the defense expert will not try to use such tactics on this young girl, as they could cause further emotional damage.  Trust, for her, is a major issue, and I expect that she will struggle with the evaluation.  It is well within the standard of practice to make known what testing will be conducted; such requests have been made of me by the opposing side in many of my evaluations, and I have readily complied. Any argument that this allows the evaluee to somehow prepare or cheat and get the correct answers in advance is simply absurd; validity scales built into psychological testing help protect against any such outcome.

If I may be of further assistance, please feel free to be in touch with me.

Sincerely,

Neil S. Kaye, MD, DFAPA

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the attached pleading was served via electronic mail on March 17, 2008 to the following counsel:

David H. Williams, Esquire
Morris James, LLC
222 Delaware Avenue, 10th Floor
P.O. Box 2306
Wilmington, DE  19899


_____/s/ Melissa A. Chionchio_____
Melissa A. Chionchio
Secretary to Gary W. Aber, Esquire