IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

JANE DOE, as the Natural Guardian of )
NANCY DOE, a Minor, MARY DOE, a )
Minor, and SUSAN DOE, a Minor, )
                                    )
         Plaintiffs, )
                                    )
         v. )     Civ. No. 05-424-SLR
                                    )
CAPE HENLOPEN SCHOOL DISTRICT, )
DANE BRANDENBERGER, JANET )
MAULL, and CINDY CUNNINGHAM, )
                                    )
         Defendants. )

---

Gary W. Aber, Esquire of Aber, Goldlust, Baker & Over, Wilmington, Delaware.
Counsel for Plaintiffs.

David H. Williams, Esquire, James H. McMackin, II, Esquire, and Allyson M. Britton,
Esquire of Morris James LLP, Wilmington, Delaware. Counsel for Defendants.

---

**MEMORANDUM OPINION**

Dated: January 7, 2011
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

On June 23, 2005, Jane Doe, as the natural mother and guardian of her minor child Nancy Doe ("Nancy")[1] (together, "plaintiffs"), filed this civil rights action pursuant to 42 U.S.C. § 1983 against the Board of Education of the Cape Henlopen School District ("Cape Henlopen"); Dane Brandenberger ("Brandenberger"), the superintendent of Cape Henlopen; Janet Maull ("Maull"), the principal of Shields Elementary School; and Cindy Cunningham ("Cunningham"), a teacher at Shields Elementary School (collectively, "defendants"). (D.I. 1)  Plaintiffs' remaining allegations[2] include a violation of Article 1, § 1 of the Delaware State Constitution based on defendants' alleged creation of an environment which promoted Christian beliefs and excluded plaintiffs' Muslim beliefs, retaliation under the First Amendment and a violation of the Equal Protection Clause of the Fourteenth Amendment. (*Id.*)  Presently before the court is defendants' motion for summary judgment. (D.I. 86)

## II. BACKGROUND

### A. The 9/11 Textbook

In September of 2003, while Nancy was enrolled in Cunningham's fourth grade class, Cunningham taught from a textbook purporting to explain the events of 9/11. (D.I. 98 at 3)  The book, which was approved by Brandenburger for use in the

---

[1]On June 22, 2010, plaintiffs withdrew the claims of Nancy's sisters, Mary Doe and Susan Doe, leaving Jane Doe and Nancy as the only remaining plaintiffs in the action at bar. (D.I. 98 at 1)

[2]On June 22, 2010, plaintiffs withdrew their claims under counts II and IV of the complaint for violations of due process and state-created danger, respectively. (D.I. 98 at 1)

curriculum, provides a brief background of Judaism, Christianity and Islam. (*Id.*; D.I. 88

at A86-A88)  Specifically, the book describes Islam as follows:

> Islam also teaches about one God.  People who practice the religion of Islam are
> called Muslims.  Muslims believe in Allah, which is the Arabic word for "God."
> They believe both Abraham and Jesus were important people.  But a man
> named Muhammad is the most important person in Islam.  Muhammad was born
> in Arabia in the year 570.  Muslims believe he was a messenger of Allah.  They
> believe Allah told Muhammad about how people should live.  They also believe
> Muhammad wrote what Allah told him in a book called the **Koran**.

(D.I. 88 at A87)  The book distinguishes peaceful Muslims from Islamic extremists like

the ones who led the terrorist attacks on 9/11:

> Most Muslims believe the Koran teaches peace.  A small group of Muslims think
> the Koran teaches war.  These people are called Islamic extremists. Islamic
> extremists make up a very small number of all Muslims.  Members of the Taliban
> are Islamic extremists.  They believe countries like the United States are evil.
> They don't like the way Americans run their government, the way Americans
> dress, or the kinds of movies Americans watch.

(*Id.* at A88)  The book also defines "terrorism" as "any time a person or group tries to

scare another person or group into changing the way they think.  The people who bomb

buildings or hijack planes are known as **terrorists**." (*Id.* at A91)  The book specifies

that Northern Ireland and the Middle East are two regions where terrorism is common.

(*Id.* at A92)  The book describes Al Qaeda members as terrorists who "believe the

Koran tells them to fight a war against countries like the United States.  Because they

think Allah is telling them to fight the war, they are willing to die for their beliefs.  They

are also very loyal to their leader Osama Bin Ladin." (*Id.* at A93)

   Nancy testified at her deposition that Cunningham led class discussions about

the book and made comments about the nature of the events of 9/11 that were not in

the book, framing it as a war of Christians versus Muslims.  (D.I. 98 at 4)  Nancy never

2

complained to Cunningham or any other school official because she was scared.  (D.I. 99 at B235:19-22)  Nancy also testified at her deposition that her classmates teased her both during and outside of class after the book was read and asked questions about how Muslim women were treated and why Nancy's mother wore a head scarf.  (D.I. 98 at 4)

### B. Cunningham's Christmas Readings

Between Thanksgiving and Christmas of 2003, Cunningham read Christmas books to her class every day.[3]  (D.I. 98 at 5)  These books, which were not part of the approved curriculum, included a story called "The Legend of the Candy Cane," which is premised on the "legend [that] there was a candy maker who wanted to invent a candy that was a witness to Christ."  (D.I. 99 at B67)  The story explains that candy canes are made of hard candy because "Christ is the rock of ages," the "J" shape signifies "Jesus," and the white color represents the purity of Christ.  (Id.)  The story describes the significance of the candy cane's stripes as follows:

> Finally, a red stripe was added to represent the blood of Christ shed for the sins of the world, and three thinner red stripes for the stripes He received on our behalf when the Roman soldiers whipped Him.  Sometimes a green stripe is added as a reminder that Jesus is a gift from God.

(Id.)  The story indicates that the candy cane's peppermint flavor is similar to hyssop, which "is in the mint family and was used in the Old Testament for purification and sacrifice.  Jesus is the pure Lamb of God, come to be a sacrifice for the sins of the world."  (Id.)  The story concludes by directing the reader to "remember the message of

---

[3]Cunningham testified that she also read articles from the Weekly Reader during this time period which discussed other religions.  (D.I. 88 at A126, 50:11-18)

3

the candymaker: Jesus is the Christ!" every time he or she sees a candy cane. (*Id.*)
Nancy testified that, in conjunction with this and other readings, Cunningham taught the
class that Christmas is a religious holiday to celebrate the birth of Jesus. (D.I. 98 at 7)
Nancy told her mother that she was upset about the books and the Christmas
discussions that repeatedly took place in the classroom, and she did not want to go to
school. (D.I. 99 at B199:3-14)

### C. Nancy's Transfer to a New Classroom

Plaintiffs made two suggestions to help Nancy feel more comfortable in school.
First, plaintiffs suggested that an apology be made to Nancy to make her feel welcome
again in Cunningham's classroom. (D.I. 99 at B272:1-22) Second, plaintiffs sought a
positive statement concerning Nancy to show the class that Nancy had done nothing
wrong. (*Id.* at B117) Robert Fulton ("Fulton"), the supervisor for curriculum and
instruction, testified that he rejected the idea of apologizing because he believed that
Cunningham had done nothing wrong, and he interpreted plaintiffs' requests as being
"stuck in the past" and "very negative." (*Id.* at B251:19-22, B263:1-21)

On January 22, 2004, plaintiffs met with Maull, Cunningham and Drewry Fennell
("Fennell") of the American Civil Liberties Union to discuss Cunningham's curriculum.
(*Id.* at B295:8-17) Brandenberger agreed to suspend Cunningham for two days with
pay to conduct an investigation. (*Id.* at B136:22 - B137:5) At the meeting, Cunningham
agreed to allow Nancy to make a presentation to the class about Ramadan or Muslim
culture. (D.I. 88 at A135, 96:6-14) On January 30, 2004, Jane Doe called to share her
concerns with Fulton as well, and Fulton notified Cunningham of these concerns in the

4

form of a memorandum advising Cunningham "to self-evaluate [her] conduct over the past few months." (D.I. 99 at B84-B85)

Nancy testified that Cunningham approached her in the classroom about a week after the meeting and, in the presence of classmates, loudly asked Nancy if she wanted to change classrooms. (*Id.* at B224:7-24) Nancy responded that she wanted "to stay here with [her] friends." (*Id.* at B225:1-15) Cunningham repeated the question, and Maull made the same inquiry later that day. (*Id.* at B225:1 - B226:21) Nancy testified that she felt like she no longer belonged in Cunningham's classroom and that she was being forced to transfer. (*Id.* at B227:1-10) The next day, Jane Doe brought Nancy to school and asked Maull to accompany Nancy to Cunningham's classroom, but Maull refused to do so and offered to transfer Nancy to another classroom instead. (*Id.* at B205:5-9)

Nancy was transferred to another classroom in February of 2004 and began seeing a therapist. (*Id.* at B125) After Nancy was transferred, her friends shunned and taunted her. (*Id.* at B232:22 - B233:2) The school counselor and Cunningham observed that Nancy was visibly upset and did not react well to being transferred. (*Id.* at B326:13-23, B173:6-13) Defendants felt that these circumstances were beyond their control. (*Id.* at B100) Due to Nancy's ongoing panic attacks, anxiety, and depression related to her attendance at Shields Elementary, Jane Doe requested and was granted homebound instruction for Nancy. (*Id.* at B212:4-18) During the summer of 2004, plaintiffs' family moved to a different school district. (*Id.* at B211:17-20) On August 27, 2004, Cape Henlopen issued a reprimand to Cunningham pursuant to an agreement

5

with the Civil Rights Division of the United States Department of Justice. (*Id.* at B91 - B92)

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)).

The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249

6

(1986). If the nonmoving party fails to make a sufficient showing on an essential

element of its case with respect to which it has the burden of proof, the moving party is

entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317,

322 (1986).

## IV. DISCUSSION

### A. Preference Clause of the Delaware State Constitution

Plaintiffs allege that defendants have violated Article I, § 1 of Delaware's State

Constitution, which provides that

> no person shall or ought to be compelled to attend any religious worship . . .
> against his or her own free will and consent; and no power shall or ought to be
> vested in or assumed by any magistrate that shall in any case interfere with, or in
> any manner control the rights of conscience, in the free exercise of religious
> worship, nor a preference given by law to any religious societies, denominations,
> or modes of worship.

This provision is analogous to the Establishment Clause and Free Exercise Clause of

the First Amendment of the United States Constitution,[4] and Delaware courts are guided

by First Amendment case law. *See E. Lake Methodist Episcopal Church, Inc. v. Trs. of*

*the Peninsula-Del. Annual Conference of the United Methodist Church*, 731 A.2d 798,

805 n.2 (Del. 1999); *Newmark v. Williams*, 588 A.2d 1108, 1112 (Del. 1991). The United

States Supreme Court has held that the government "may not promote or affiliate itself

with any religious doctrine or organization" and "may not discriminate among persons on

the basis of their religious beliefs and practices" under the First Amendment. *County of*

*Allegheny v. ACLU*, 492 U.S. 573, 591 (1989). In the context of public schools, the First

---

[4] The First Amendment provides that "Congress shall make no law respecting an
establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I.

7

Amendment prohibits religious instruction on school grounds, and "the content of a public school's curriculum may not be based on a desire to promote religious beliefs." *Id.* at 591 n.40 (internal citations omitted).

To determine whether a government practice in a public school setting violates a student's freedom of religion, courts apply the *Lemon* test, which provides that governmental action violates the Establishment Clause if (1) it lacks a secular purpose, (2) its primary effect advances or inhibits religion, or (3) it "foster[s] an excessive government entanglement with religion." *Stratechuk v. Bd. of Educ., S. Orange-Maplewood Sch. Dist.*, 587 F.3d 597, 604 (3d Cir. 2009) (quoting *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971)). Under the first prong of the *Lemon* test, "it is appropriate to ask whether government's actual purpose is to endorse or disapprove of religion," whereas the second prong assesses the effect of the action without regard to the government's actual purpose. *Id.* at 604-06 (quoting *Wallace v. Jaffree*, 472 U.S. 38, 56 (1985)). The court must regard the character and purpose of the action under the third prong of the *Lemon* test, which "requires more than mere interaction between church and state, for some level of interaction has always been tolerated." *Child Evangelism Fellowship of N.J. Inc. v. Stafford Twp. Sch. Dist.*, 386 F.3d 514, 534 (3d Cir. 2004) (internal quotations omitted); *see also Petruska v. Gannon Univ.*, 462 F.3d 294, 311 (3d Cir. 2006). The Third Circuit has also considered Establishment Clause claims under the "endorsement test," which dispenses with the *Lemon* test's entanglement prong and asks "whether a reasonable observer familiar with the history and context of a religious display would perceive it as a government endorsement of religion." *Stratechuk*, 587

8

F.3d at 608-09 (internal quotations omitted).

Defendants contend that they did not coerce Nancy in violation of the Free
Exercise Clause by reading the 9/11 textbook and the Christmas books because Nancy
was never required to affirm or deny any religious beliefs in connection with the
readings. (D.I. 87 at 36-37)  Moreover, defendants contend that plaintiffs fail to allege a
violation of the Establishment Clause because the class readings had a secular purpose
and were read for entertainment purposes, not to advance or inhibit religion. (D.I. 100 at
3)  According to defendants, a reasonable observer would not view the books as
endorsing religion. (*Id.* at 4)  Plaintiffs respond that Nancy was forced to endure daily
Christmas presentations which had no secular purpose and excluded all other religious
holidays. (D.I. 98 at 23, 25-27)

The court concludes that genuine issues of material fact remain as to whether
Cunningham's Christmas readings violated Nancy's rights under the Preference Clause
of Delaware's State Constitution.  A reasonable jury could find that phrases such as
"Jesus is the pure Lamb of God, come to be a sacrifice for the sins of the world" and
"remember the message of the candy maker:  Jesus is the Christ!" lack a secular
purpose and endorse Christianity. (D.I. 99 at B67)  Moreover, a reasonable jury could
find that a candy cane symbolically striped with the blood of Christ is not a secular
symbol. (*Id.*)  Given the above, genuine issues of material fact exist as to whether
Cunningham had any class discussions about the Christmas readings that also violated
the Preference Clause.  As such, the court shall deny defendants' motion for summary
judgment with respect to plaintiffs' claims under the Preference Clause of Delaware's
State Constitution as to the Christmas readings and discussion.

9

However, after viewing the evidence in the light most favorable to plaintiffs, the court concludes that no genuine issues of material fact exist, and plaintiffs' claim under the Preference Clause should be dismissed as a matter of law, with respect to the 9/11 textbook. The court concludes that the 9/11 textbook portrays historic events in an even-handed manner, serving a secular educational purpose that neither enhances nor inhibits religion. Specifically, the 9/11 textbook raises the issue of religion only in the context of the 9/11 terrorists' stated purpose and distinguishes the 9/11 terrorists, who identified themselves as Muslim, from the vast majority of Muslims, who "believe the Koran teaches peace." (D.I. 88 at A88)

Moreover, plaintiffs' initial complaints in September 2003, which took the form of two letters with attachments sent to Cunningham and Bradenberger, were limited to the contents of the 9/11 textbook and did not mention any concurrent class discussions. (D.I. 88 at A1 - A34) The evidence of record indicates that plaintiffs first raised the existence of 9/11 class discussions during a telephone call with Fulton on January 30, 2004, more than four months after Jane Doe's meeting with Cunningham to discuss her concerns about the 9/11 curriculum. (D.I. 99 at B85) Nancy's deposition testimony, which took place more than four years after the 9/11 textbook was read, is the only evidence of record that specifically addresses the contents of the class discussions. (D.I. 99 at B217:20-24) The court concludes that this evidence is insufficient to establish a genuine issue of material fact with respect to any alleged discussions about the 9/11 textbook. The court shall grant defendants' motion for summary judgment as it pertains to such.

## B. Retaliation

It is well established that "retaliation for the exercise of constitutionally protected rights is itself a violation of rights secured by the Constitution actionable under § 1983." *White v. Napoleon*, 897 F.2d 103, 111-12 (3d Cir. 1990). The First Amendment bars retaliation for protected speech. *See Crawford-El v. Britton*, 523 U.S. 574, 592 (1998); *Milhouse v. Carlson*, 652 F.2d 371, 373-74 (3d Cir. 1981). Proof of a retaliation claim requires that plaintiffs demonstrate (1) they engaged in protected activity, (2) they were subjected to adverse actions by a state actor, and (3) the protected activity was a substantial motivating factor in the state actor's decision to take adverse action. *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001) (quoting *Mt. Healthy Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). To prove that the state actor's action is sufficiently adverse, plaintiffs must show that the allegedly retaliatory conduct is sufficient "to deter a person of ordinary firmness from exercising his First Amendment rights." *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000) (internal quotations omitted).

Defendants contend that, even if Nancy engaged in constitutionally protected activity by complaining about the books read in class, Nancy's transfer to another classroom does not constitute an adverse action by defendants because Nancy chose to be transferred instead of remaining in Cunningham's class. (D.I. 87 at 31-32) Furthermore, defendants contend that they transferred Nancy because of their motivation to help her in school, not to harm her. (*Id.*) Plaintiffs respond that defendants took adverse action when Cunningham confronted Nancy in the classroom in response to Nancy's complaints, and defendants refused to consider solutions other than Nancy's

11

transfer to another classroom despite plaintiffs' concerns. (D.I. 98 at 37-38)

Viewing the evidence in the light most favorable to plaintiffs, the court concludes that a reasonable jury could find that Nancy's transfer to another classroom constituted an adverse action motivated by plaintiffs' complaints. Plaintiffs presented evidence of their repeated requests to avoid Nancy's transfer to another classroom, Cunningham's confrontation with Nancy in the classroom, and defendants' dismissal of a school counselor's suggestions for alternatives to transfer. A reasonable jury could conclude that defendants' actions would deter a person of ordinary firmness from exercising her First Amendment rights. Moreover, this evidence raises a triable issue as to defendants' motive in failing to accept an alternative to transfer. Therefore, the court shall deny defendants' motion for summary judgment with respect to plaintiffs' First Amendment retaliation claim.

### C. Equal Protection

#### 1. Religious discrimination

"To bring a successful claim under 42 U.S.C. § 1983 for a denial of equal protection, plaintiffs must prove the existence of purposeful discrimination. They must demonstrate that they received different treatment from that received by other individuals similarly situated." *Keenan v. City of Philadelphia*, 983 F.2d 459, 465 (3d Cir. 1992) (quoting *Andrews v. Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990)); *see also Williams v. Morton*, 343 F.3d 212, 221 (3d Cir. 2003). To prove that the discrimination was purposeful, plaintiffs must show that defendants "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects

upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979); *see also Cal. Parents for Equalization of Educ. Materials v. Noonan*, 600 F. Supp. 2d 1088, 1112 (E.D. Cal. 2009) (holding that hostile statements and procedural irregularities that impacted only Hindu groups raised triable issues of fact regarding purposeful discrimination). Discrimination between religious groups is primarily protected by the First Amendment, while the Equal Protection Clause "merely demands that such distinctions not be arbitrary." *Busch v. Marple Newtown Sch. Dist.*, Civ. A. No. 05-2094, 2007 WL 1589507, at \*14 n.28 (E.D. Pa. May 31, 2007) (citing *Reed v. Faulkner*, 842 F.2d 960, 962 (7th Cir. 1988)).

Defendants contend that they did not discriminate against Nancy based on her religious beliefs because the Christmas books focused on secular symbols, and Cunningham agreed to allow Nancy to teach the class about Muslim culture. (D.I. 87 at 19) Plaintiffs respond that Christian students were able to celebrate their religious holiday in school whereas Nancy was not. (D.I. 98 at 36) Although Nancy was permitted to make a presentation to the class, plaintiffs contend that Cunningham expressly forbade her from making a presentation on Ramadan. (*Id.*)

Viewing the evidence in the light most favorable to plaintiffs, the court concludes that genuine issues of material fact remain as to whether the Christmas readings violated Nancy's equal protection rights. Despite Cunningham's awareness of Nancy's religious beliefs following Nancy's complaint about the 9/11 book, Cunningham proceeded to read Christmas books every day for a month and did not recognize other religious holidays in a similar manner. A reasonable jury could find that Cunningham's actions were purposeful in light of Nancy's prior concerns and her experience of being singled out and teased by

13

her classmates due to her religious beliefs. Moreover, a reasonable jury could find that Nancy was treated differently from her classmates because she was subjected to religious readings that did not represent her beliefs. The court, therefore, shall deny defendants' motion for summary judgment with respect to plaintiffs' equal protection claim based on religious discrimination.

### 2. Deliberate indifference

To hold defendants liable for discrimination in violation of the Fourteenth Amendment based on their responses to the in-school harassment of a student by other children, plaintiffs must show that defendants acted with deliberate indifference. *Gant ex rel. Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 140 (2d Cir. 1999). "Deliberate indifference to discrimination can be shown from a defendant's [clearly unreasonable] actions or inaction in light of known circumstances." *Id.* The deliberate indifference standard is "not a mere reasonableness standard that transforms every school disciplinary decision into a jury question," and a court may identify a school's response as not "clearly unreasonable" as a matter of law on a motion for summary judgment. *Id.*; *see also Yap v. Oceanside Union Free Sch. Dist.*, 303 F. Supp. 2d 284, 294 (E.D.N.Y. 2004) ("[T]he ultimate failure of [school official's measures to end the harassment by other students] does not mean that plaintiffs have created a jury question with regard to deliberate indifference.").

School administrators receive substantial deference in cases of alleged student-on-student harassment. Victims of harassment may not make "particular remedial demands," and school administrators will only be held liable if they are deliberately

14

indifferent to "harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 648-50 (1995); *see also Dawn L. v. Greater Johnstown School Dist.*, 586 F. Supp. 2d 332, 369 (W.D. Pa. 2008). It is not enough to show that a student has been teased or called offensive names; the school administrators' response must be "clearly unreasonable." *Davis*, 526 U.S. at 649, 652.

Defendants contend that their actions in responding to allegations of Nancy's harassment did not constitute deliberate indifference because defendants promptly responded to each of Nancy's complaints as soon as defendants were made aware of the circumstances. (D.I. 87 at 18) Specifically, defendants contend that they reviewed the books in controversy and stopped using them in the classroom, met with plaintiffs, provided diversity training to the teachers, suspended Cunningham while investigating her conduct, investigated allegations that other students were harassing Nancy, and conducted several character building lessons in the classroom with a focus on students respecting peers and religious tolerance. (*Id.*)

Plaintiffs respond that defendants' investigation into the allegations of student harassment was delayed and insufficient, and defendants failed to give Nancy a reasonable alternative to home-managed education or involuntary transfer to another classroom. (D.I. 98 at 32) Plaintiffs further contend that defendants ignored plaintiffs' request for an apology or a statement to the class that Nancy had done nothing wrong, ignored the professional opinion of the school counselor that such actions would be helpful to Nancy's return to school, and failed to monitor Cunningham during the 2004-

15

2005 school year pursuant to an agreement reached with the Department of Justice. (D.I. 98 at 32-34)

After viewing the evidence in the light most favorable to plaintiffs, the court concludes that no genuine issues of material fact exist and plaintiffs' claim for deliberate indifference should be dismissed as a matter of law. Nancy's transfer to another classroom was not a clearly unreasonable response by defendants. Under *Davis*, defendants were not required to honor plaintiffs' "particular remedial demands" of requiring Cunningham to apologize to Nancy and make a statement to the class. Defendants took action in response to plaintiffs' complaints, and the fact that the action taken was not the particular remedial action requested by plaintiffs is insufficient to withstand summary judgment on a claim of deliberate indifference. Moreover, the teasing and name-calling Nancy suffered following the transfer does not rise to the level of being "severe, pervasive, and objectively offensive" as a matter of law. *Davis*, 526 U.S. at 649, 652. Therefore, the court shall grant defendants' motion for summary judgment with respect to the issue of deliberate indifference under the Fourteenth Amendment.

### D. Qualified Immunity

The court must proceed through a two step inquiry to decide whether a defendant is protected by qualified immunity: (1) whether plaintiff has proven that there was, in fact, a constitutional violation; and (2) whether that right was clearly established prior to the violation. *Curley v. Klem*, 499 F.3d 199, 206-07 (3d Cir. 2007) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223

16

(2009)).[5] If no constitutional right has been violated, "there is no necessity for further inquiries concerning qualified immunity." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

Defendants contend that plaintiffs' claims should be dismissed under the doctrine of qualified immunity because plaintiffs fail to establish the violation of a colorable constitutional or statutory right. (D.I. 87 at 38)  Plaintiffs respond that Cunningham's knowing and intentional violation of the right to be free of religious preferences deprives her of any claim for immunity, and the remaining defendants' actions in responding to Cunningham's actions deprives them of immunity as well. (D.I. 98 at 40)  The court concludes that genuine issues of material fact exist regarding whether defendants are protected by qualified immunity.  As previously discussed, plaintiffs have alleged sufficient facts for a reasonable jury to conclude that defendants violated Nancy's well established constitutional rights.  Therefore, the court shall deny defendants' motion for summary judgment with respect to the issue of qualified immunity.

## V. CONCLUSION

For the foregoing reasons, defendants' motion is granted in part and denied in part.  An appropriate order shall issue.

---

[5]In *Pearson v. Callahan*, the Supreme Court overruled *Saucier*'s requirement that the two prongs of the qualified immunity test be determined sequentially.  129 S. Ct. at 818 (holding that "[t]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at had").

17